UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WILLIAM SOLANO,                                                    CASE NO.

     Plaintiff,

vs.

THE ART OF SHAVING - FL, LLC,
a Florida Limited Liability Company,

     Defendant,

_____/

## COMPLAINT FOR DECLARATORY AND
## INJUNCTIVE RELIEF, AND JURY TRIAL DEMAND

Plaintiff, WILLIAM SOLANO, through undersigned counsel, sues Defendant, THE ART OF SHAVING - FL, LLC, a Florida Limited Liability Company (hereinafter referred to as "Art of Shaving"), for declaratory and injunctive relief, and damages, and alleges as follows:

1)      This action is brought under Title III of the Americans With Disabilities Act ("ADA"), that is codified in 42 U.S.C. §§12181-12189.

2)      This action is also brought pursuant to 28 C.F.R. Part 36.

3)      This Court has jurisdiction over this case based on federal question jurisdiction, as provided in 28 U.S.C. §1331 and the provisions of the ADA.

4)      Furthermore, because this Court has jurisdiction over the ADA claim, the Court has supplementary jurisdiction over Plaintiff's common law tort claim pursuant to 28 U.S.C. §1367.

5)      Plaintiff is sui juris, and he is disabled as defined by the ADA and ADA Amendments Act of 2008, 42 U.S.C. §12101 ("ADAAA").

6)      Defendant, Art of Shaving is a Florida limited liability company authorized to do business and doing business in the State of Florida.

7)      Defendant, Art of Shaving owns and operates retail stores that sells hand-crafted razors, shaving accessories, body washes, and colognes for men.  There are retail locations in Miami-Dade County.

8)      Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9)      Plaintiff desires to prevent discrimination and demands equal access to Defendant's internet website to purchase beard wash, beard conditioning set, lavender starter kit with bag, and Olibanum Pepper shaving cream.

10)     Plaintiff also seeks declaratory and injunctive relief for trespass against the Plaintiff's computer.  The computer is Plaintiff's personal property, and a claim for trespass attached to same.

11)     The Defendant is also liable for compensatory damages to Plaintiff as a result of the trespass to Plaintiff's personal property.

12)     The remedies provided under common law for trespass are not exclusive, and same may be sought in connection with suits brought under the ADA.

13)     Venue is proper in the Southern District of Florida, Miami-Dade Division, since all events, actions, injuries, and damages complained of herein occurred in the Southern District of Florida.

14)     Furthermore, Plaintiff is a resident of Miami-Dade County which falls within the Miami Division of the Southern District of Florida.

15)     At all relevant times, Plaintiff is and was visually impaired and permanent, incurable Rhegmatogenous Retinal Detachment in his left eye and debilitating Glaucoma in his right eye.

16)     Plaintiff's visual impairment interferes with his day-to-day activities and causes limitations in visualizing his environment.  As such, Plaintiff is a member of a protected class

under the ADA, 42 U.S.C. § 12102(1) - (2), the regulations implementing the ADA set forth at 28 CFR §§ 36.101, et seq., and in 42 U.S.C. 3602, §802(h).

17)    Plaintiff regularly uses the computer, but he needs the assistance of special software for visually impaired persons.  The software that he uses is screen reader software that is readily available commercially.

18)    Defendant is a private entity which owns and operates retail locations.  The stores are open to the public, and each of Defendant's locations is defined as a "public accommodation" within the meaning of Title III of the ADA because Defendant is a private entity which owns and/or operates "[A] bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment," per 42 U.S.C. §12181(7)(E) and 28 C.F.R. §36.104(2).

19)     Defendant's website is a place of public accommodation per 42 U.S.C. Section 12181(7)(E) because it's an extension of Defendant's brick and mortar stores.  The public is able to locate the Defendant's retail stores and allows consumers to purchase razors, shaving accessories, body washes, colognes, and gift cards on Defendant's website, view items available at Defendant's stores, create an online account, and sign up for email updates on Defendant's latest product launches, events and exclusive offers.

20)    Since the Defendant's website is a public accommodation, it must comply with the requirements of the ADA.  The website cannot discriminate against individuals with disabilities.

21)    Plaintiff is a customer of Defendant who is and was interested in purchasing beard wash, beard conditioning set, lavender starter kit with bag, and Olibanum Pepper shaving cream through Defendant's website and at Defendant's stores and visiting Defendant's brick and mortar locations.

22)    Plaintiff is not able to visit the physical locations without the assistance of a family member or caretaker, so the ability to purchase merchandise on Defendant's website for delivery to his home is important to his as an alternative when he is not able to visit the Defendant's stores.

23)    The Website also services Defendant's physical stores by providing information on its brand of merchandise, its collections, sales campaigns, and other information that Defendant is interested in communicating to its customers about its physical locations.

24)    Since the website allows the public the ability to locate Defendant's physical stores and retail locations, sells merchandise offered for sale by Defendant from its physical stores, allows consumers to purchase gift cards, create an online account, and allows visitors to sign up for an email account to receive updates on Defendant's latest product launches, events and exclusive offers, the website is an extension of, and gateway to, Defendant's physical stores. By this nexus, the website is characterized as an intangible service, privilege and advantage provided by a place of public accommodation as defined under the ADA, and thus an extension of the services, privileges and advantages made available to the general public by Defendant through its retail brick and mortar stores.

25)    Because the public can view and purchase Defendant's merchandise that is also offered for sale by Defendant at its physical stores, allows the customers to sign up for an electronic account, and allows visitors to sign up for an email account to receive updates on Defendant's latest product launches, events and exclusive offers, the Website is an extension of and gateway to the physical stores, which are places of public accommodation pursuant to 42 U.S.C. § 12181(7)(E). As such, the Website, as an intangible service, privilege and advantage of Defendant's brick and mortar locations, must be fully accessible and in compliance with the ADA, must not discriminate against

individuals with disabilities, and must not deny full and equal enjoyment of the same services, privileges and advantages afforded to the general public both online and at the physical locations.

26) At all times material hereto, Defendant was and still is an organization owning and operating the Website. Since the Website is open through the internet to the public as an extension of the retail stores, by this nexus the Website is an intangible service, privilege and advantage of Defendant's brick and mortar locations, and Defendant has subjected itself and the associated Website it created and maintains to the requirements of the ADA.

27) Plaintiff is and/or has been a customer who is interested in patronizing, and intends to patronize, Defendant's physical stores, and purchase Defendant's merchandise, sign up for Defendant's email program and make purchases both online through the Website and at Defendant's physical stores.

28) The opportunity to shop Defendant's merchandise and secure information from his home for eventual use in Defendant's physical stores are important accommodations for Plaintiff because traveling outside of the home as a visually disabled individual is often a difficult, hazardous, frustrating, confusing, and frightening experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually disabled individuals using screen reader software.

29) Like most consumers, Plaintiff accesses numerous websites at a time to compare merchandise and prices, sales, discounts, and rewards programs. Plaintiff may look at several dozens of sites to compare features and prices.

30) During the month of December 2019, Plaintiff attempted on several occasions to utilize the Website to browse through the merchandise and on-line offers to educate himself as to the

merchandise, sales, discounts, and promotions being offered, and with the intent to make a purchase through the Website or at one of Defendant's physical stores.

31)   Places of public accommodation are not just brick-and-mortar structures. The United States Department of Justice and the binding case law increasingly recognize that private entities are providing goods and services to the public through websites that operate as places of public accommodation under Title III.

32)   Defendant is required to make reasonable accommodations to its websites for individuals with disabilities to allow them to participate in web-based promotions and obtain goods or services via the Internet just as sighted persons are able to do.

33)   Plaintiff utilized Chrome Vox ("Screen Reader Software") to attempt to purchase the merchandise on Defendant's website. However, the Plaintiff was not able to freely and fully use Defendant's website because it contains access barriers that make it inaccessible to persons with disabilities, and for which there is no reasonable accommodation for the Plaintiff.

34)   A person who can see can enjoy the benefits and privileges provided by Defendant's website that include, but are not limited to locating the Defendant's retail stores, purchasing razors, shaving accessories, body washes, colognes, and gift cards on defendant's website, viewing items available at Defendant's stores, creating an online account, and signing up for email updates on Defendant's latest product launches, events and exclusive offers.

35)   A person who cannot see, like the Plaintiff in this case, cannot go to Defendant's website and avail themselves of the same privileges. Thus, the Plaintiff has suffered discrimination due to Defendant's failure to provide a reasonable accommodation for Plaintiff's disability.

36)     The Department of Justice has provided useful guidance regarding website accessibility under the ADA, and the binding and persuasive case law in this district has applied the Web Content Accessibility Guidelines ("WCAG") 2.0 or 2.1 to determine accessibility.

37)     Defendant's website does in fact fail the following WCAG 2.0-AA Compliance standards and it does not provide sufficient alternatives to serve the equivalent purpose:

Applicable WCAG 2.0 Standard at Issue: *Standard 3.3.2 Labels or Instructions (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 3.3.2 Labels or Instructions.*

Applicable WCAG 2.0 Standard at Issue: *Standard 2.4.3 Focus Order (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 2.4.3 Focus Order.*
Applicable WCAG 2.0 Standard at Issue: *Standard 3.3.1 2.1.1 Keyboard (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 2.1.1 Keyboard.*

Applicable WCAG 2.0 Standard at Issue: *Standard 2.4.1 Bypass Blocks (Level A)*.

Nature of the Violation: required by WCAG 2.0's *Standard 2.4.1 Bypass Blocks.*

Applicable WCAG 2.0 Standard at Issue: *Standard 3.2.5 Change on Request (Level AAA)*.

Nature of the Violation: required by WCAG 2.0's *Standard 3.2.5 Change on Request.*

38)     Furthermore, Defendant's website does not contain accessibility assistance that would direct a visually impaired person like the Plaintiff to someone who he can contact for assistance, questions, or concerns.

39)     Thus, Defendant has not provided full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations provided by and through the website, in contravention of the ADA.

40)     On information and belief, Defendant is, and at all times has been, aware of the barriers to its website which prevent individuals with disabilities who are visually impaired from

comprehending the information within same, and is also aware of the need to provide access to all persons who visit its site.

41)    Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged in this Complaint, such that this suit for declaratory judgment and injunctive relief is his only means to secure adequate and complete redress from Defendant's discriminatory practices in connection with use of its website.

42)    Notice to Defendant is not required because of Defendant's failure to cure the violations.

43)    Enforcement of Plaintiff's rights under the ADA is right and just pursuant to 28 U.S.C. §§ 2201 and 2202.

44)    Plaintiff has retained the undersigned attorneys to represent his in this case, and has agreed to pay them a reasonable fee for their services.

## **COUNT I – VIOLATION OF THE ADA**

45)    Plaintiff realleges paragraphs 1 through 44 as if set forth fully herein.

46)    Defendant owns and operates the  https://www.theartofshaving.com website, and is a public accommodation subject to the ADA pursuant to 42 U.S.C. §12181(7)(E).

47)    Defendant's website is inaccessible to persons with disabilities like the Plaintiff, who is visually impaired.  Plaintiff was not able to enjoy full and equal access to the information and services that Defendant has made available to the public on its website, in violation of 42 U.S.C. §12101. *et seq*, and as prohibited by 42 U.S.C. §12182 *et seq*.

48)    Defendant's website is not in compliance with the ADA.

49)    Defendant has made no reasonable accommodation for Plaintiff's disability.

50)      A cursory review of a portion of the Defendant's website revealed that the website is not accessible to persons like the Plaintiff that are visually impaired as required by law and for which there is no sufficient alternative on Defendant's website, including:

Applicable WCAG 2.0 Standard at Issue: *Standard 3.3.2 Labels or Instructions (Level A).*

Nature of the Violation: required by WCAG 2.0's *Standard 3.3.2 Labels or Instructions.*

Applicable WCAG 2.0 Standard at Issue: *Standard 2.4.3 Focus Order (Level A).*

Nature of the Violation: required by WCAG 2.0's *Standard 2.4.3 Focus Order.*
Applicable WCAG 2.0 Standard at Issue: *Standard 3.3.1 2.1.1 Keyboard (Level A).*

Nature of the Violation: required by WCAG 2.0's *Standard 2.1.1 Keyboard.*

Applicable WCAG 2.0 Standard at Issue: *Standard 2.4.1 Bypass Blocks (Level A).*

Nature of the Violation: required by WCAG 2.0's *Standard 2.4.1 Bypass Blocks.*

Applicable WCAG 2.0 Standard at Issue: *Standard 3.2.5 Change on Request (Level AAA).*

Nature of the Violation: required by WCAG 2.0's *Standard 3.2.5 Change on Request*

51)      Due to Defendant's failure to provide an ADA compliant website, the Plaintiff has been injured since he has been denied full access to Defendant's website.

52)      As a result, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303 to correct the inaccessibility that leads to discrimination against visually impaired persons.

WHEREFORE, Plaintiff requests entry of judgment in his favor and against Defendant for the following relief:

A.  A declaration that Defendant's website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update its website, and continue to monitor and update its website on an ongoing basis, to remove barriers in order that individuals with visual

disabilities can access, and continue to access, the website and effectively communicate with the website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within its website, wherein the logo [1] would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of the website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to insure compliance thereto.

E. An Order directing Defendant, by a date certain to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to its website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for its website to insure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.  An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of its website to identify any instances where the website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review.

J.   An Order directing Defendant, by a date certain, to make publicly available and directly link from its website homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of its website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems.

K.  An award to Plaintiff of his reasonable attorney's fees, costs and expenses; and

Such other and further relief as the Court deems just and equitable.

---



[1]

## **COUNT II – TRESPASS**

53)   Plaintiff realleges paragraphs 1 through 44 as if set forth herein.

54)     Defendant's website contains software analytics.  Since Plaintiff has navigated Defendant's website as stated herein, Plaintiff's computer and the personal information and browsing history stored therein, has suffered a trespass by Defendant.

55)     Plaintiff never consented to and was unaware that Defendant's website was placing software on his computer.

56)     Defendant committed common law trespass in violation of Florida law against Plaintiff because Plaintiff did not consent to the placement of tracking and information securing software on his personal computer, which was done without his knowledge and consent.

57)     Defendant's trespass has damaged Plaintiff by affecting the condition and value of his computer.

58)     On its website, Defendant has an internet privacy policy section that can only be accessed by clicking a a barely visible section at the bottom of the page called "Privacy",  providing that they use cookies and similar technologies to collect a consumer's information and they obtain non-public information from their users for their own advertising and marketing purposes by placing software on its website that collects a website user's preferences and internet browsing habits as follows:

*what we collect*

- *Information you give us*
- *Information we collect when you contact us, visit our sites, use our mobile applications or services, use our products or devices, or view our advertisements*
- *Information we get from other companies who have obtained your consent to share or sell it or have ensured that other companies from whom they have received your information can share it with them and, in turn, with us and/or other companies*
- *Information we get from other companies when you visit their websites*

*We may combine any and all of this information to help create better products, services, and consumer experiences.*

### *how we use your information*

- *Send you the products and services you ask for*

- *Tell you about our and our marketing partners' products and services*

- *Help us run our sites and services*

### *how and when we share your information*

- *When we have your consent, with our carefully selected partners so that they can send you offers, promotions, or ads about their products and services we believe you may be interested in*

- *With other companies we hire to help us run our business*

- *As part of a sale of a P&G brand or business to another company*

- *To help us protect our rights or property, e.g., fraud prevention or information security*

- *When required by law or government authorities*

### *your choices*

*You can tell us how we can use your information by clicking on the links below:*

- *Marketing communications*

- *Interest-based advertising*

**How We Collect Your Information**

We collect information about you in many ways from many places. Some of the information we collect may include personal information that can be used to identify you; for example, your name, email address, telephone number, or postal address. In some countries like those in the EU, things like IP address or cookie and mobile device identifiers may also be considered personal information.

<u>Please note</u> : We may combine all of the information we collect about you to give you better products, services, and user experiences.

**you provide it to us.** You give us your information when signing up for an account on our websites or in mobile apps or by calling or emailing us. We may ask for things like your name, email or home address, date of birth, payment information, your age, gender, the number of people in your family, and the way you want us to send you information about our products and services—for example, to your home address, email address, or by texting you.

**from sites and emails.** We may use technologies that automatically collect information when you visit our sites, view our advertisements, or use our products or services. For example, we use cookies (a tiny file stored on your computer's browser) to tell us what browser and operating system you are using, your IP address, web pages you visit, links you click, or whether you have or have not opened an email from us.

**from mobile applications and internet connected devices.** To give you the best possible user experience, we may use technologies that collect information from your phone when you use our mobile apps or from "smart" devices in your home. You consent to do this when downloading the app or installing household internet connected devices. This information could include your mobile phone or other device advertising ID, information about your phone's operating system, how you use the app or device, and your physical location. You will get a pop up notice on your phone or device that gives you the option to accept or reject allowing us to know your precise geolocation (exactly where you are standing or where you are accessing the internet).

**from other places.** We may get information that other companies share with or sell to us. For example, you may have given consent for another company to share your personal information

with us when you signed up for telecom services or a retailer loyalty points program. We may also collect information from places that you know everyone can see, such as from internet postings, blog entries, videos, or social media sites. We may also receive information from other companies who are in the business of collecting or aggregating information about you sourced from publicly available databases or from consent you have given to their use and subsequently our use of your information. This might be information about your income level, age, gender, number of people in your family, and products you have bought on the internet or from stores in your neighborhood.

### How We Use Your Information

We use your information to help us meet our purpose of touching and improving the lives of people like you every day around the world. We use your information to respond to your questions or requests for information, send you products or samples you have requested, help you manage your P&G site or app preferences, allow you to enter our contests or sweepstakes, or process your payment for the products you buy from us. We may also use your non-personal information (e.g., purchase data, sample requests, etc.) in consumer research or analytics (or personal information when you have consented to participate in such research) to learn more about what consumers want so that we can make new products or improve the ones we already have.

Another way we use your information is to make sure that what you hear from us is relevant and useful to you as an individual. For example, we may send you information about Gillette® products if you have shown interest in our shaving products by visiting Gillette.com. When we do this, we will use your information – a cookie ID or device ID -- to limit the number of times you see the same advertisement from Gillette. We want you to hear from us about the products you use and love without you hearing the same message over and over again.

We may also use aggregate information from many people without identifying any individuals to better understand how our websites are being used or to study consumer habits so that we can make products and offer services that meet the needs of all consumers sharing some of the same things in common. For example, we can learn a lot about consumers who are new parents reading our baby product websites, so that we can better serve new parents everywhere with the products and services they want. Use of such non-personal information in this way helps to safeguard your privacy. We will always try to use non-personal information whenever possible for this reason.

*To further protect your privacy, we will also use the least amount of information we can to accomplish the task at hand, put measures in place to prevent mixing information in ways that would allow cookie and device IDs to specifically and directly identify you (e.g., by name), and delete your information when we no longer need it for our business purposes.*

### How We Safeguard Your Information

*We respect your personal information and take steps to protect it from loss, misuse, or alteration. Where appropriate, these steps can include technical measures like firewalls, intrusion detection and prevention systems, unique and complex passwords, and encryption. We also use organizational and physical measures such as training staff on data processing obligations, identification of data incidents and risks, restricting staff access to your personal information, and ensuring physical security including appropriately securing documents when not being used*

### What We Share

**with other companies.** *When we have your consent, we may share your information with select partners so they can send you offers, promotions, or ads about products or services we believe you may be interested in. For example, people who receive P&G emails from our diaper brands such as Pampers® may also consent to hear about baby formulas made by other companies. We do not sell your personal information to marketers outside of P&G. We may share information that does not personally identify you with other companies for any purpose.*

**with service providers.** *We may need to share your information with companies who help us run our business, including hosting our sites, delivering our emails to you, analyzing the data we collect, and sending you the products and services you requested. We share only the personal information needed for these companies to complete the tasks we request. They are required to protect your information in the same way we do and will not share it or use it for any other purpose.*

**other situations.** *If a brand or one of our businesses with which you've shared personal data is sold to another company, your data will be shared with that company. As a result, your account*

and the personal data in it will not be deleted unless you tell the brand or new company that you want it deleted. We may also share your information with companies who help us protect our rights and property, or when required by law or government authorities.

### Your Rights and Choices

**marketing** You can tell us to stop sending you email and text messages by following the opt-out instructions sent with these communications. You can also choose to stop receiving marketing email, SMS, or postal mailings by clicking here. While we will honor your choices, we may need to keep information to do so. For example, if you tell us to stop sending marketing emails, we will need your email address on file so that our systems remember that you no longer wish to receive marketing communications to that email address.

### Cookies

Cookies are small files sent to your computer as you surf the web.  They store useful information about how you interact with the websites you visit.  Cookies do not collect any information stored on your computer or device or in your files.  Cookies do not contain any information that would directly identify you as a person.  Cookies show your computer and device only as randomly assigned numbers and letters (e.g., cookie ID ABC12345) and never as, for example, John E. Smith.

We use cookies for a number of reasons, such as:

- to serve you with relevant advertising
- to learn more about the way you interact with P&G content
- help us improve your experience when visiting our websites
- to remember your preferences, such as a language or a region, so there is no need for you to customize the website on each visit
- to identify errors and resolve them
- to analyze how well our websites are performing

These are the types of cookies we use:

- ***session cookies.*** *Webpages have no memory. Session cookies remember you (using a randomly generated ID like: ABC12345) as you move from page to page so that you don't get asked to provide the same information you've already given on the site. For example, session cookies are extremely helpful when shopping online—without them the items you place in your shopping cart would disappear by the time you reach the checkout! These cookies are deleted as soon as you leave our site or close your browser.*

- ***persistent cookies.*** *Persistent cookies allow sites to remember what you prefer when you come back again. For example, if you choose to read the site in French on your first visit, the next time you come back the site will appear automatically in French. Not having to select a language preference every time makes it more convenient, more efficient, and user-friendly for you.*

- ***advertising cookies.*** *These cookies can be used to learn about what interests you generally might have, based, for example, on the websites you visit and the products you buy. This can also help us infer things about you such your age, marital status, and how many kids you may have. That data allows us to send you ads for products and services that better fit the things you like or need. It also allows us to limit the number of times you see the same advertisement.*

- ***analytics cookies.*** *These cookies tell us how our websites are working. In many cases, we use Google analytics cookies to monitor the performance of our sites. Our ability to use and share information collected by Google Analytics about your visits to our sites is restricted by the Google Analytics Terms of Use and the Google Privacy Policy .*

***How you can control cookies.*** *You can set your browser to refuse all cookies or to indicate when a cookie is being sent to your computer. However, this may prevent our sites or services from working properly. You can also set your browser to delete cookies every time you finish browsing.*

***Other Technologies.***

- ***proximity-based beacons.*** *Beacons send one-way signals to mobile apps you install on your phone over very short distances to tell you, for example, what products are on-sale as you walk through a store. Beacons only talk to your device when you get close enough and after you have given consent within the mobile application associated with a particular beacon. In turn, apps may provide us location*

information to help customize advertising and offers to you. For example, when you are near a beacon in the skin care section of a supermarket, we may send you a $4 off coupon.

- **pixels.** These are small objects embedded into a web page, but are not visible. They are also known as "tags," "web bugs," or "pixel gifs." We use pixels to deliver cookies to your computer, monitor our website activity, make logging into our sites easier, and for online marketing activity. We also include pixels in our promotional email messages or newsletters to determine whether you open and act on them.

- **mobile device identifiers and SDKs.** We use software code in our mobile apps to collect information similar to what cookies collect on the internet. This will be information like your mobile phone identifiers (iOS IDFAs and Android Advertising IDs) and the way you use our apps. Similar to cookies, the device information we collect automatically as you use our apps will never identify you as a person. We only know a mobile device as randomly assigned numbers and letters (e.g., advertising ID EFG4567) and never as, for example, John E. Smith.

- **precise geolocation.** We may receive information about your exact location from things like global positioning system (GPS) coordinates (longitude and latitude) when you use our mobile apps. You will always get a pop-up notice on your phone or device asking for you to accept or reject allowing us to know exactly where you are in the world. You should understand that we will not always ask for consent to know generally that you are in a broader city, postal code, or province. For example, we do not consider it to be precise location if all we know is that you are somewhere in Manila, Philippines.

### Interest-Based Advertising

When you visit our partner sites, we can show you ads or other content we believe you would like to see. For example, you may receive advertisements for Tide® laundry detergent if we notice that you are visiting sites that sell children's clothing or school supplies. And from that information we may conclude that you have children and therefore could well be interested in a powerful laundry-cleaning product. In this way, we intend to send you relevant information about our products that might be of benefit to you.

***we learn from groups of consumers sharing similar interests.*** *We may place you into a particular group of consumers who show the same interests. For example, we may put you in the group of "razor aficionados" if we see you frequently purchase razors online or you could be a "bargain-shopper" if we notice you use online coupons or look for discounts or sales. We notice these things about you as you look at web pages, links you click on our websites and other websites you visit, mobile applications you use, or our brand emails you view and links you click in the emails. We group together cookie and device IDs to help us learn about general trends, habits, or characteristics from a group of consumers who all act similarly online and/or offline. By doing this, we can find and serve many others who "look like" those already in the group and thereby send them what we believe will be relevant and beneficial product offers and information.*

***we link other information to your cookie and device IDs.*** *Your cookie and device IDs may be supplemented with other information, such as information about the products you buy offline or information that you provide directly to us when creating an account on our sites. We generally do this in ways that will not directly personally identify you. For example, we could know that cookie ID ABC12345 belongs to the razor aficionado group based on person's web site visits, age, gender, and shopping habits, but we would not know that person's name or address or other information that would identify him or her as a person. Should we ever want to personally identify your cookie or device information (web and app viewing history), we will always ask you before doing so.*

***we may know you across all of your computers, tablets, phones, and devices.*** *We may know that cookie ID ABC12345 is from a computer that that may be connected to the same person or household owning the mobile phone with device ID EFG15647. This means that you may search for diapers on your laptop, click on a Google search result link which we have sponsored, and then later see an ad for our Pampers® brand diapers on your mobile phone. We might assume or deduce that the same person owns the computer and phone because, for example, they sign on to the same WiFi network every day at the same time. Understanding what devices seem to be used by a person or household helps us limit the number of times you see the same ad across all of your devices. And this is important because that way you don't get annoyed at us for spamming you with the same ad and we don't pay for such repetitive ads that we don't want you to receive.*

***how you can stop receiving interest-based ads.*** *To stop receiving P&G interest-based advertising, you can <u>click here</u> or click on the WebChoices or AppChoices icons on one of our sites or in one of our mobile applications. You can also prevent getting interest-based ads on websites by*

declining cookies in your browser(s), declining the "access to data" requests that apps usually present when you install them, or by adjusting the ad tracking settings on your device.

**you will still see "contextual" ads even if you opt out of interest-based ads.** *Even if we stop sending you interest-based ads, you will still get ads from our brands on your computer or mobile devices. These ads, however, are based on the context of the sites you visit and are called contextual ads. Unlike interest-based ads which are based on pages you visit on your mobile phone or computer viewing activities, contextual ads are ads shown to you based on the context of the specific site you are visiting. For example, you still may see an ad for one of our baby care brands while looking at nursery products online because these sites traditionally have had mostly new or expecting parents as visitors. You should also know that we may still collect information from your computer or devices and use it for other purposes like evaluating how our websites work, for consumer research, or detecting fraud.*

**deleting cookies also deletes your opt out.** *When you opt out of interest-based advertising, we send an opt-out cookie to your browser that tells us that you no longer want to receive interest-based ads from us. Your opt-out cookie will be deleted if you decide to delete <u>all</u> cookies. This means that you will need to opt-out again if you still do not want to receive interest-based ads.*

59)     Due to Plaintiff's disability, he could not understand Defendant's website and he could not give informed consent to Defendant's installation of data and information tracking software on his computer. Defendant also could not give informed consent to Defendant's collection of his browsing history and the placement of analytics on his computer.

60)     Thus, Plaintiff has no adequate remedy at law to redress Defendant's knowing and reckless disregard for Plaintiff's right to exclude others from his computer and determine which programs should be installed and operated on his computer.

WHEREFORE, Plaintiff demands judgment against Defendant for Plaintiff's damages, interest, costs, and such further relief as the Court deems just and equitable.

## <u>Request for Jury Trial</u>

61)     Plaintiff requests a jury trial.

Submitted by:

Mendez Law Offices, PLLC
Attorneys for Plaintiff
P.O. BOX 228630
Miami, Florida 33172
Telephone: 305.264.9090
Facsimile: 1-305.809.8474
Email:info@mendezlawoffices.com
By: _____/s/_____
DIEGO GERMAN MENDEZ, ESQ.
FL BAR NO.: 52748

Adams & Associates, P.A.
Attorneys for Plaintiff
6500 Cowpen Road, Suite 101
Miami Lakes, FL  33014
Telephone:  305-824-9800
Facsimile:  305-824-3868
Email:  lr1208@live.com
By: _____/s/_____ ____
LYDIA C. QUESADA, ESQ., of Counsel
FL BAR NO.: 191647